CHRYSTAL GEORGE ET AL., APPELLEES, v. ARDITH JONES ET AL., APPELLANTS.

95 N. W. 2d 609

Filed March 13, 1959. No. 34455.

*Nate C. Holman, Emory P. Burnett,* and *John R. Brogan,* for appellants.

*Perry & Ginsburg,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action in equity brought in the district court for York County by Chrystal George and Felice George, plaintiffs, against Ardith Jones as the surviving widow of Harry Jones, deceased, and as administratrix of his estate, the heirs at law of Harry Jones, deceased, and one Adolph Hromas, defendants. The purpose of the action was for a forfeiture and cancellation of a mineral

lease and to quiet title of all mineral rights in certain land in the plaintiffs. The trial court found generally in favor of the plaintiffs and against the defendants; that the lease set forth and described in the plaintiffs' petition had been forfeited and that plaintiffs were entitled to a cancellation thereof; and that the title and right of possession in the real estate involved should be quieted and confirmed in the plaintiffs. The trial court ordered the defendants to immediately remove from said premises their gravel stock piles and all structures, machinery, and equipment belonging to the defendants. The defendants filed a motion for new trial. Upon the overruling of the motion for new trial, the defendants appealed.

The record shows that Ardith Jones is the surviving widow of Harry Jones, deceased, and administratrix of his estate; that Gale D. Jones, Irene Jones Nelson, and Ivan W. Jones are adults and heirs at law of Harry Jones, deceased; that James Vance Jones, Sandra Jones, Thomas Jones, and Samuel Jones are minor heirs at law of Harry Jones, deceased; that a guardian ad litem was appointed by the court to represent the interests of the minors; and that Adolph Hromas, a defendant, was a person to whom Ardith Jones, administratrix of the estate of Harry Jones, deceased, granted certain rights to remove gravel under a lease which will hereinafter be described.

There appears in evidence a gravel lease which was entered into in February 1956, by and between Chrystal George and Felice George as lessors, and Harry Jones as lessee. Insofar as need be considered in the instant case, the lessors leased to the lessee the following described real estate: The southeast quarter of Section 12, Township 9 North, Range 2 West of the 6th P. M., in York County, for the sole purpose and with the exclusive right to excavate and remove gravel to any extent lessee might desire. Lessee was given the right of ingress and egress over a selected route for hauling gravel

from said premises, and was also granted the right to construct and maintain any machinery, buildings, or equipment that might be required by him for the excavation, storage, or removal of gravel. This lease was granted to the lessee for a term of 5 years from March 1, 1956, and was to expire on March 1, 1961. The lessee agreed to pay as rental the sum of 10 cents for each cubic yard of gravel removed from the premises by the lessee, such rental being payable monthly during the term of the lease, commencing on April 1, 1956, and on the first day of each month thereafter. The provisions of this lease were binding on the parties thereto, their executors, administrators, heirs, and assigns.

The plaintiffs' petition alleged the ownership in them of the premises heretofore described; the interests of the respective defendants relating to the gravel lease and their relation to the lessee; and the entering into of the lease. It further alleged that since the death of Harry Jones, the lessee under the lease, the defendants had taken over and assumed the lease but had failed to use any diligence whatever in mining or extracting gravel from the premises, and failed to make reasonable effort to extract gravel from said premises; that for the entire period since the date of the death of Harry Jones the defendants, although repeatedly warned by the plaintiffs of their obligations in this respect, had failed and refused to continue the efforts to mine and remove gravel from the premises; and that by reason of the failure of the defendants to work and operate under the lease with reasonable diligence, the lease became forfeited and plaintiffs were entitled to cancellation of the same. The plaintiffs prayed for a determination of their rights under the lease, including a determination that the lease was forfeited and that title to the real estate be quieted in the plaintiffs; that defendants be required to remove their personal property therefrom; and for general equitable relief.

The defendants, by answer, admitted the ownership

of the real estate described in the plaintiffs' petition to be in the plaintiffs, but denied that plaintiffs were entitled to immediate possession thereof; admitted the execution of the gravel lease and the assumption of it by defendants according to its terms, and that certain machinery located on the leased property belonged to the defendants; but otherwise generally denied the allegations of the petition.

The defendants' answer affirmatively alleged that defendants had sought to operate the lease diligently since the death of Harry Jones, the lessee under the lease; that certain royalty payments had been made under the lease and further payments refused by plaintiffs; that there had been difficulty in keeping the machinery in repair, which fact was made known to the plaintiff Chrystal George who agreed that any delay because of such difficulty would not place defendants in default under the lease; and that operations had been continued and royalties tendered pursuant to the lease. The prayer of the answer was for dismissal of the plaintiffs' petition at plaintiffs' costs.

The plaintiffs' reply was a general denial of the allegations of the answer, except such as admitted allegations of the petition.

The answer of the guardian ad litem to the plaintiffs' petition was a general denial.

The defendants assign as error that the finding of the trial court for the plaintiffs was based on insufficient evidence; that the trial court erred in rendering judgment for a forfeiture of the gravel lease; and that the trial court erred in overruling the defendants' motion for new trial.

Elmer George testified that Chrystal George is his wife and Felice George is his daughter; that they are the owners and lessors of the gravel lease, wherein Harry Jones is designated as the lessee, of the property heretofore described; that he looked after the interests of his wife and daughter in this property and had busi-

ness dealings with Harry Jones during his lifetime while Harry Jones was operating the gravel pit under the lease; and that the only consideration for the lease was the payment of royalties of 10 cents for each cubic yard of gravel taken from the property by the lessee. This witness then detailed the amount of royalty payments received from the date of the start of the lease, which was March 1, 1956, to January 1957.

Harry Jones died on July 13, 1956. Gale Jones took over the operation of the lease the latter part of June 1956 and operated it until about a week or so in January 1957.

Elmer George further testified that the royalty for March 1956 was $108.50, based on the production of 1,080 cubic yards. It might be stated at this point that the amount of royalty is based on the number of cubic yards. For instance, $108.50 would be for 1,085 cubic yards. Hereafter we will not use the figure of cubic yards. In April 1956 the royalty was $147.50; in May, $107.50; in June, $65.50; in July, $188; in August, $337; in September, $281; in October, $162.30; and in November, $80.50. On January 16, 1957, there was a royalty of $22.50, which constituted the pumping by Gale Jones for the month of December. This lack of production was due to cold weather, the gravel pit being frozen so that pumping could not be done. There was a small royalty in January 1957, of $6.40. That was when Gale Jones terminated his operation of the gravel pit. Thereafter, in March 1957, Adolph Hromas started to operate the gravel pit. The royalty for March 1957 was $6; for April, $8; for May, $8; for June, $11.75; for July, $10.50; and for August, $31.50. The payments for July and August 1957, had been tendered to the lessors, but refused. This witness further testified that he had no knowledge of the production in September, as nothing was tendered in the way of royalties. He knew of only three loads of gravel in October, and no tender was made at that time. He made a trip to see Hromas in June

1957, and had a conversation with him in which he told Hromas he was very unhappy with the operation, and indicated that Hromas could be more successful operating under different circumstances on the property, to which Hromas told this witness he could pump where he pleased. Hromas would pay no attention to instructions given him by this witness. He further testified that he observed the premises at various times during the 2 months immediately preceding the trial of this law suit; that the entire operation of the gravel pit during that time was three loads of gravel; that by watching others test for gravel he was competent to determine where the best gravel could be found; that he made no tests himself, but acquired what knowledge he had over a period of 15 or 20 years by observation of others who were engaged in the business.

There are two exhibits in evidence, exhibit No. 13 and exhibit No. 14, which are jars of road gravel prepared by this witness. Exhibit No. 13 is gravel taken from a stock pile made by Gale Jones, and exhibit No. 14 is a sample of gravel pumped by Hromas and taken out of his gravel bin. This witness stated that both of these exhibits were fair samples of gravel produced by the respective operations. The type of gravel represented by exhibit No. 14 should never be stock piled.

On cross-examination this witness testified that after Harry Jones died, he and Gale Jones talked over the matter with reference to the operation of the gravel pit and as a result of this conversation Gale Jones decided to take over the operation of the gravel pit which resulted in a very successful operation; and that there were floods in June and July 1957, which were fairly heavy, and some things were washed away in this flood.

Dean Sack testified that he was engaged in the banking and road construction business; that he had had gravel pumps along the Blue River for 25 years and was familiar with the various types of gravel produced in York County, and their availability and use for road

purposes; that he was presently engaged in the gravel business and familiar with the George land; that he made tests on this land as to the availability of gravel; and that tests were made by him and Harry Jones 2 or 3 years previous and they found gravel that could be used for commercial purposes. He further testified as to what was required for road gravel to be acceptable for highway purposes; that they found that gravel could be produced with reasonable cost and at a profit, but there was no way to tell how much gravel was available in the ground; that the minimum acreage containing commercial gravel amounted to about 12 to 15 acres; that he and Harry Jones were in partnership in gravel operations when the lease heretofore mentioned was executed; that he was familiar with the market demand for road gravel in York County all during the year of 1957; that York County bought more gravel that year than had been purchased in any one year for the past 20 years; that there was a strong demand for grade "A" commercial gravel in York County and this was true in 1957; that the entire production of gravel from the George land could have been sold; that exhibit No. 13 appears to be a very good grade of clean road gravel; that exhibit No. 14 is somewhat similar to the gravel as shown in exhibit No. 13, but contains more dirt and fine sand and would have to be reprocessed before it could be marketable as road gravel; that when Gale Jones was operating the pump on the George land for this witness after the death of Harry Jones, he pumped as much as 200 cubic yards of gravel per day, but 100 to 150 cubic yards per day would be about right; that if this pump had pumped 150 yards of commercial road gravel per day it could have been sold; and that there was some flooding in June 1957, along the property involved, but that should not have delayed production for more than 2 weeks.

On cross-examination he testified that there were two gravel pits operating in the same area, one of which

was the one on the plaintiffs' property; that all of the gravel purchased by York County was purchased from this witness; and that the flood in June 1957 was a serious flood and did a considerable amount of washing in the whole area of the Blue River. This witness further testified on cross-examination that he attempted to acquire the gravel pit involved in this case; that he made an offer to the defendants for it two or three times; and that if this particular gravel pit was properly operated it would be capable of meeting the demand. On redirect examination he testified that a gravel pit that would produce 315 yards of gravel a month would not be considered a commercial gravel pit.

Gale Jones testified that he had been in the gravel business at different times for a period of 18 years; that in the summer of 1956, he tested the leased premises for gravel and discovered that for a depth of 16 feet there was all commercial grade gravel under approximately a 10-acre area, which would take about 2 years to exhaust; that he tested only to a depth of 16 feet, but found that he could pump to a depth of 40 feet; and that he took over the operation of the gravel pit shortly before his father died and continued to operate it until the first week of January 1957. He further testified to the volume of monthly production as heretofore set out; and that the drop in production would be due to the effect of cold weather and the necessity for certain repairs. He further testified that the pits cannot be operated during real cold weather, particularly when the water is frozen, and also when it is windy and freezing; that the floods in June should have delayed operations for not more than 2 weeks; that exhibit No. 13 is a good, washed road gravel, a commercial grade product; that exhibit No. 14 is sandy and dirty gravel that would not pass for commercial gravel; that this condition is the result of improper screening; and that the gravel shown in exhibit No. 14 could be sold commercially for fill purposes but not as a road gravel. He

further testified that while he was operating the gravel pit he had gravel similar to that as shown by exhibit No. 14, which would have to be rejected, and the fault corrected; that the gravel pit in question should produce from 100 to 150 cubic yards per day; that the only reason which could be attributed to the production figures for March 1957 to September 1957, would be no operation of the gravel pit; that there had been only minor changes in the equipment from the time he operated the gravel pit as near as he could discern from the exhibits; and that the bin was about in the same condition as when he was operating it.

On cross-examination he testified that commercial production from this gravel pit would be about 150 cubic yards per day, but during the time he operated the pit he had commercial production for only a few days each month. He further testified that during the month of July 1956, he had commercial production for about 10 days; during August he had commercial production for about 22 days; during September he had commercial production for less than 15 days; in November for less than 5 days; and that during the period from July 1956 to November 1956, he made payments under the lease to Chrystal and Felice George. He further testified on cross-examination that dirty gravel in the bin could result from a cave-in of the river bank and that the gravel as shown in exhibit No. 14 could have been the result of a cave-in; and that when he concluded his operation of the gravel pit the bin was not in good shape and needed repairs, among which was a new spill floor.

On redirect examination he testified that the minimum average monthly production from this gravel pit should be 1,500 cubic yards, but under ideal conditions it would be from 3,500 to 4,000 cubic yards.

Ardith Jones, now Ardith Jones Dollarhide, testified that she was the wife of Harry Jones, now deceased; and that she was operating the gravel lease with Mr.

Hromas and had not assigned the lease to any person. She further testified that Mr. Sack claimed to own the gravel equipment, and after her husband's death he and Gale Jones operated the gravel pit without her authority, and she received no compensation from them of any kind; that she had had considerable difficulty with Mr. Sack who was interested in the gravel lease; that she paid off the mortgage on the equipment to Mr. Sack; and that she had a conversation over the telephone with Elmer George in which he wanted to know how soon she was going to get the equipment operating and she told him she had just paid off the mortgage 2 days before and did not have anyone to operate the gravel pit at that time. She also had a conversation with Chrystal George before the mortgage was paid off and Mrs. George expressed dissatisfaction with the operation of the gravel pit by Gale Jones and Mr. Sack for the reason that they failed to itemize in their accounts where the gravel had been sold. Mrs. George did not believe she was getting all the royalties that she was entitled to from them and requested this witness to furnish her itemized statements which would be complete. At that time this witness told Mrs. George that there would be a delay in the operation of the gravel pit, but she would endeavor to get the operation going as soon as possible, and Mrs. George said she understood the difficulties and that there was no hurry. Mr. Hromas was to operate the gravel pit and this witness apparently agreed to take orders for gravel, which she did occasionally.

On cross-examination she testified that her arrangement with Hromas was that he was to pay her 15 cents a cubic yard for gravel removed, and in addition was to pay the royalty to the plaintiffs. She sold the equipment to Hromas and had not personally tried to operate the equipment under the gravel lease. She had no understanding with Hromas as to how long he would operate the equipment on the land in question, and he

could remove his equipment at any time he chose to do so. She further testified that Hromas was the only person she was able to find to operate the gravel pit, although she made efforts to find others; that she used the proceeds of the sale of the equipment which she received from Hromas to pay off the mortgage on it to Mr. Sack; and that the only compensation she received from the gravel pit was the income under the operation of the same by Hromas.

Adolph Hromas testified that he had little knowledge of the operation of gravel pits except that he had worked with a man engaged in such operations; that during his operation of the gravel pit on the land in question he stock piled gravel, placing it on top of the stock pile that was already there; that any gravel taken from a stock pile shortly before the trial would have been placed there by him; that he had gravel in the bin similar to that shown in exhibit No. 14, as did everyone else along the valley, and had such gravel in his bin shortly before the trial; that this gravel was the result of a cave-in of the river bank; that such gravel is usually sold at a discount to farmers for road work but cannot be sold as a good commercial grade of gravel; and that at the time of trial he had, and had previously, sold gravel similar to that shown by exhibit No. 13.

On cross-examination he testified to the production during his operation of the gravel pit, and gave figures which correspond essentially to those heretofore set forth. He further testified that the reason production had not been higher was due to breakdowns in the machinery and the lack of orders for gravel; and that the June floods occasioned a 2-week delay, after which the pumping drew lots of mud.

With reference to certain letters that he had written to Mrs. George, they apparently describe efforts being made to obtain production of gravel. Exhibit No. 4, a letter, contains a statement that: "When ever we get are (sic) casing plant going then we will need all the

sand and gravel we can pump." With reference to this matter, Hromas testified that they were making concrete irrigation casings at Crete, but due to the rain no casings were being used or made or sent over there. The same letter discloses an attempt to obtain a state contract which was unsuccessful because of inability to meet very short completion dates, and in addition, an unsuccessful bid on a Seward County contract for 25,000 yards of gravel, with the low bid being certain to result in a loss.

In exhibit No. 5, a letter, appears the statement: "Things are now starting to open up for us," and discloses plans that were under way for adding more equipment. In addition it contains the statement: "Next year I think we have place for 25,000 cu. yds. * * *." This would require more pumping equipment, which Hromas agreed to procure.

He further testified that he tendered royalty payments for July and August, but these checks were returned; and that after he received the checks back, he attempted to place them in escrow with the First National Bank of York, and never saw them again until the plaintiffs introduced them into evidence. Then there is a check for the September royalty which was sent to the bank to be placed in escrow, but was returned. He further testified that he conferred with Mrs. Jones about the operation, and she had taken orders for gravel to be filled by him. Mrs. Jones apparently just took orders for gravel occasionally, as she had no telephone.

Mrs. Chrystal George testified on rebuttal that she had no recollection of telling Mrs. Jones that there was no hurry in proceeding with the production of gravel. She could recall no conversation relating to the delays caused by difficulties in the estate matter of Harry Jones, deceased. She did recall having discussed the desirability of being furnished a record of sales along with the royalty check, which Mrs. Jones agreed to do.

Elmer George on rebuttal testified that exhibit No.

13 had not been taken from a stock pile which Hromas had placed on top of the one started by Gale Jones. He was certain of this because he was there when Jones dumped the stock pile, and the Gale Jones stock pile was then inaccessible because of a water slough. The Hromas stock pile was about 20 rods west of the one from which he took exhibit No. 13.

This case is for trial de novo in this court.

The lease in question is considered by the parties as a mining lease. It is the contention of the defendants that in this state there must be an abandonment of such a lease before a forfeiture will be declared. By our research we find no authority to sustain the contention of the defendants in this respect, nor has any authority directly in point been cited by the defendants on this point.

We are cognizant that courts of equity abhor forfeitures, that they are odious in law and not favored by the courts and will not be enforced unless the facts which purport to require such drastic action come clearly and plainly within the provisions of the law or of the lease, as the case may be. See Donnelly v. Sovereign Camp W. O. W., 111 Neb. 499, 197 N. W. 125.

We deem the following authorities applicable to the factual situation in the instant case.

In Phillips v. Hamilton, 17 Wyo. 41, 95 P. 846, it was held that even though a lease of land for mining purposes contains no express covenant or stipulation for diligence in the matter of exploration, nor any requirement as to the amount of work to be done within any stated period of time, yet if the consideration of the lease is a royalty to be paid to the lessor on the product of the mine, there is an implied covenant that the work of prospecting and development shall be prosecuted with reasonable diligence.

In Cotner v. Mundy, 92 Okl. 268, 219 P. 321, it was held that where the only consideration for the lease of a sand and gravel pit for a long period of years was a

royalty on the sand and gravel removed, and the lease contained no express provision for continuous operation or for forfeiture for failure to develop and operate the pit, there was an implied covenant on the part of the lessee to develop and operate the pit with reasonable diligence. See, also, Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S. W. 2d 1039.

An annotator presents the following in such respect. Where the consideration for the lease of land for the mining of minerals therefrom is the agreement by the lessee to pay a royalty on the product mined, this stipulation is construed to indicate it to be the intention of the parties that the lessee shall develop the leased premises for minerals to the mutual profit of himself and the lessor, and from this presumed intent there springs the implied obligation on the part of the lessee to develop the premises and mine the product. See Annotation, 60 A. L. R. 901.

As stated in Mansfield Gas Co. v. Alexander, 97 Ark. 167, 133 S. W. 873: "And the general rule for the construction of mineral leases, such as is involved in this case, is that the law implies a covenant upon the part of the lessee to make the exploration and search for the minerals in a proper manner and with reasonable diligence and to work the mine or well when the mineral is discovered, so that the lessor may obtain the compensation which both parties must have had in contemplation when the agreement was entered into."

Where a lessee covenants expressly to pay the lessor a certain royalty on all the minerals or products that may be mined under a mining lease, even though there is no express covenant that the lessee shall work the mine continuously, or in any particular way, or at all, there is manifestly an implied covenant on his part that he will work it as such mines are usually worked, with ordinary diligence, under the surrounding circumstances; not, indeed, simply for his own advantage and profit, but as well to the end that the lessor may secure the

actual consideration for the lease. Such a covenant arises by necessary implication. It would be unjust, unreasonable, and countervene the nature and spirit of the lease, to allow the lessee to continue to hold his term for a considerable length of time, without making any effort to work the mine. Such a construction of the rights of the parties would enable him to prevent the lessor from getting his royalties under the express covenant to pay for the same, and deprive him of all opportunity to work the mine himself, or permit others to do so. The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice. It is of the essence of the lease, necessarily implied, that the lessee shall work the mine with reasonable diligence, or surrender the lease. See Conrad v. Morehead, 89 N. C. 31.

In addition to the foregoing authorities relating to mining leases such as in the instant case, the trial court, at the request of counsel for the plaintiffs, viewed the premises. On this point the following authority is applicable.

When an action in equity is appealed, it is the duty of this court to try the issues de novo and to reach an independent conclusion without reference to the findings of the district court. But in a case wherein the court has made a personal examination of the physical facts, and where, in the same case, the oral evidence in respect of material issues is so conflicting that it cannot be reconciled, this court will consider the fact that such examination was made and that such court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite. See, City of Wilber v. Bednar, 123 Neb. 324, 242 N. W. 644; Hehnke v. Starr, 158 Neb. 575, 64 N. W. 2d 68.

With the foregoing authorities in mind, and in considering the evidence heretofore set out, it appears that the arrangement alleged to have been made between

Ardith Jones Dollarhide and Hromas, to pay her a royalty of 15 cents for every cubic yard of gravel extracted and in addition to pay the plaintiffs 10 cents per cubic yard, was not a substantial arrangement in any respect. There is no evidence to disclose the term of this arrangement, and it is apparent that Hromas could remove the equipment from the property at any time he desired. The manner and form of Mrs. Dollarhide in taking orders for gravel is not very convincing. She did not have the means to do so. In order to sell a product of this kind it is a matter of common knowledge that it requires some solicitation on the part of the operator of the gravel pit.

It also appears from the evidence that Hromas made no diligent or reasonable effort to sell this product. He simply advanced the idea of being able to sell gravel in the future. It is obvious that he failed to process this gravel as grade "A" road gravel which was in great demand for road purposes and could have been sold. Making allowances for the time that the gravel pit could not have been operated due to the condition of the weather, due to cave-ins and repairs of machinery if such were needed, and break-downs upon which there is a complete lack of evidence, by comparison of figures relating to the royalties paid and the amount of gravel extracted by the original lessee and by Gale Jones who operated with Mr. Sack, the lack of pumping and excavating gravel by Hromas discloses a complete lack of reasonable diligence. We will not repeat the figures, but call attention to them as they appear previously in the statement of facts. We do state, however, that the capability of the gravel pit is no mystery, nor is it an unknown quantity as the evidence discloses. The original lessee and his son, Gale Jones, operated the gravel pit successfully as the production records indicate. The production of the defendants for a 7-month period from February 1957 to August 1957, amounted to 757.5 cubic yards. The original lessee and his son, Gale Jones,

produced more gravel in a single month than defendant Hromas had produced in 7 months of operating. During the working season when gravel could be produced, an average of 100 to 150 cubic yards of gravel per day can be taken from this gravel pit and processed as commercial grade "A" gravel for road purposes. Under ideal conditions this could be raised to 3,500 to 4,000 cubic yards per month. The record discloses without question that the defendants failed to use any degree of reasonable diligence in mining the gravel and disposing of it.

We conclude, in the light of the evidence adduced and the authorities heretofore cited, that the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.