[Civ. No. 1309. Fifth Dist. Oct. 4, 1971.]

CATHERINE S. RUSSELL, as Executrix, etc., et al.,
Plaintiffs and Appellants, v.
JOHNS MANVILLE CO. et al., Defendants and Respondents.

## COUNSEL

Rowell, Lamberson, Thomas & Hiber and Breckinridge Thomas for Plaintiffs and Appellants.

Lonergan, Jordan, Gresham & Varner and John B. Lonergan for Defendants and Respondents.

## OPINION

**GARGANO, J.**—Appellants brought this action in the court below for declaratory relief and to quiet title to numerous unpatented mining claims located in the New Idria Mining District west of Coalinga. However, the controversy presently centers on the enforceability of an alleged mining lease to five unpatented mining claims known as Joaquin, Black Ridge, Hidden Spring, Sugar Loaf, Pine Flat and Dick Spring; the Pine Flat and Dick Spring claims were located by J. M. Koski, the Joaquin and Black Ridge claims were located by Mrs. Koski, and the Hidden Spring and Sugar Loaf claims were located in the names of the Koskis' minor daughters, Karolyn May Koski and Lois Koski. We shall recite only those facts that are pertinent to resolve this controversy.

In the year 1954 appellants, three partners operating through a corporation named the Southwest Oil Company, were engaged in mining chromite ore under a mining lease on a group of mining claims known as the James-Corbett claims and were selling the ore to the United States government under a stockpiling program. In the summer of that year appellant E. F. Chambers concluded that there was a large chromite deposit on the Koski claims, and as the representative of the partnership met Mr. Koski who suggested a mining lease. Later the two men met in the law offices of a Mr. Leckman, and at their request Leckman drew up a lease.[1] The lease

[1]Leckman had done some work for Koski, and there was a dispute as to whose lawyer he was. Chambers eventually resolved the dispute by testifying that Leckman, in drawing the lease, had represented both parties.

was for a period of 20 years, and for so long as the lessees produced mineral substances from the leased claims; it provided for the payment of royalties to lessors but did not expressly require the lessees to engage in mining activities, to do any development or mining work or make any improvements, nor did it provide for the payment of a minimum rental or minimum royalties; it merely required appellants to do the discovery work on four claims, with the Koskis to contribute the sum of $328 for the performance of that work.

On September 7, 1954, Mr. Koski signed the lease on behalf of himself and as the attorney in fact of Mrs. Koski and his two minor daughters. Thereafter, appellants did the required location work, and Koski contributed the sum of $328 toward the work. On January 24, 1955, a new lease was executed by appellants and all of the Koskis containing the same terms as the first instrument, except that the provisions relating to the discovery work were omitted. It was signed by all of the Koskis, apparently because Mr. Koski had no authority to sign the first lease on behalf of the members of his family; in his findings, the trial judge considered the two documents to be the leasing agreement.

After obtaining the Koski mining lease, appellants continued to mine and produce chromite ore from the James-Corbett claims. They also secured another lease from the Butler estate on chromite bearing land adjoining the Koski claims. Appellants then became involved in litigation relating to the Butler estate and eventually secured possession of that property. In the latter part of 1955, appellants began to produce chromite ore from the adjoining Butler property, and from 1955 to June 1958, when the government stockpiling program came to an end, produced substantial quantities of ore from the property and sold it to the United States government. In the meanwhile, appellants engaged in no mining activities of any consequence on the Koski claims and produced virtually no ore of any kind from these properties, even though it is conceded that the properties contained valuable deposits of chromite, cinnabar and asbestos; they made no improvements, did no geological mapping and made no production studies or cost analyses; appellants merely did the annual assessment work.

In 1959 the Kern County Land Company entered the New Idria Mining District, and by 1960 had located numerous mining claims in the same general area as the Koski claims; some of the claims were on open land and others overlapped the Koski claims. In the following year, on February 24, 1961, the Koskis contracted to sell their claims to the Union Carbide Corporation. Union Carbide surveyed the Koski boundaries, and pursuant to its agreement with the Koskis filed amended claims in its own name; these amendments intentionally included excessive areas in an attempt to

invalidate known prior claims of the Kern County Land Company and were ineffective and void. In May 1961, Union Carbide quitclaimed the Koski claims back to the Koskis, who in turn sold them to the Central California Minerals Company. Then Central California Minerals quitclaimed the claims to the Coalinga Asbestos Company, Inc.; Coalinga Asbestos, Inc. had also acquired the Kern County Land Company claims.

At the conclusion of the court trial the trial judge made extensive findings of fact and conclusions of law. At first glance, the court's findings appear to be inconsistent, but when they are viewed as a whole and reconciled with all reasonable inferences and necessary implications, it is apparent that the court's decision was this: The court found that the instrument the Koskis signed in January of 1954 was a lease, not a license as respondents maintained. The court then found that because the lease purported to tie up valuable chromite mining deposits and other valuable ores for a period of 20 years, with no obligation on the lessee's part to do anything whatever to develop the property, particularly during the existence of an advantageous government stockpiling program, or to pay minimum rentals or minimum royalties, it was so harsh, unreasonable and inequitable "as to require a court of equity to refuse to enforce it." The court therefore concluded that the lease contained an implied condition, imposing a duty upon the lessees to use reasonable diligence in developing the property for the purpose for which it was leased and that appellants' failure to do so was deliberate and unconscionable and completely frustrated the lessor's hopes and intentions, resulting in a forfeiture and abandonment of their leasehold interest. Judgment was entered accordingly, and appellants appeal.

Preliminarily, we observe that respondents' argument that the instrument the Koskis signed in January 1954 was in reality a license which was revoked when the Koskis sold their claims to the Central California Minerals Company is persuasive. (*Shaw* v. *Caldwell,* 16 Cal.App. 1 [115 P. 941]; *Carlisle* v. *Lady,* 109 Cal.App. 567 [293 P. 686]; *Von Goerlitz* v. *Turner,* 65 Cal.App.2d 425 [150 P.2d 278].) The instrument is entitled a lease and it contains the words "grant, demise and let," but it only gives the lessees a limited possession for special purposes, i.e., "the exclusive right of prospecting for and mining for and producing, taking and removing ore. . . ." Also, although the instrument gives appellants the right to enter the premises to construct and maintain buildings, structures, smelters and machinery, appellants were not obligated to do so or to prospect, develop, mine or produce any ore from the property; at most they were obligated to pay royalties if they produced ore and sold it to the government or to other purchasers. Arguably, the alleged lease conferred a privilege on appellants to occupy the premises for prospecting and mining

purposes and was intended to ripen into a leasehold only if and when ore were produced in paying quantities.

■ We do not reach the issue as to whether the agreement in question was a lease or a license. We have concluded that even if it is assumed that the agreement was a lease, as the trial judge found, his decision that appellants abandoned and forfeited their leasehold interest is supported by both the law and the evidence.

Generally speaking, mineral leases are in the same category as ordinary leases and are governed by the same rules. Nevertheless, it is recognized that in certain aspects such leases are in a class by themselves and must be treated accordingly. (*Gold Min. & Water Co.* v. *Swinerton,* 23 Cal.2d 19 [142 P.2d 22].) In ordinary leases the lessor is not concerned with the development or operation of the property by the lessee; his primary concern is the payment of the rent as it becomes due. ■ In a mineral lease, the lessor's main concern is the development of the land into a mineral producing property, and in the payment of the royalties he will receive from the sale of the ore produced. Thus, "[w]here the method of mining the property is not specified . . . the lessee is obligated to mine the property in a reasonable manner compatible with the most expeditious removal of the mineral therein, taking into consideration the costs involved, the contemplation of the parties, and the nature and character of the property to be mined." (*Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d 19, 37.) ■ Further, if the lease does not expressly obligate the lessee to engage in mining activities, and if the only consideration is the share he will obtain in the mineral produced from the payment of a royalty, the law implies an agreement on the lessee's part to proceed with mining operations with reasonable diligence. (*Payne* v. *Neuval,* 155 Cal. 46 [99 P. 476].) The implied agreement is deemed a condition which results in a forfeiture and abandonment of the lease if the condition is broken. (*Acme Oil and Mining Co.* v. *Williams,* 140 Cal. 681 [74 P. 296]; *Hall* v. *Augur,* 82 Cal.App. 594 [256 P. 232]; *Mansfield Gas Co.* v. *Alexander,* 97 Ark. 167 [133 S.W. 837]; *George* v. *Jones,* 168 Neb. 149 [95 N.W.2d 609].)

■ Clearly, appellants' conduct in relation to the Koski claims was unconscionable and resulted in an abandonment and forfeiture of their leasehold interest. Appellant Chambers talked to Mr. Koski about a lease on the Koski claims after Chambers had concluded that there was a large chromite deposit on the property; Chambers testified that he was of the opinion that the many tons of chromite ore taken from the general area had originated in the vicinity of the Koski claims and that trenching was sufficient to confirm his geological deduction; he also admitted that Mr. Koski had been told that appellants were going to put a mill on the property and that

if the claims warranted it, and if they could be mined economically, appellants were going to engage in large scale mining operations. Furthermore, appellants knew that the Koskis wished to take advantage of the stockpiling program; the lease mentioned the program, stating that it was scheduled to extend until June 30, 1957, and providing for a royalty of $8 per long dry ton for all ore sold to the government; Mr. Koski testified that he repeatedly requested appellants to commence mining operations and to produce chromite ore for resale to the government.[2] Nevertheless, from the period commencing in January 1954, when the leasing agreement was signed by the Koskis, to June 30, 1957, when the stockpiling program was scheduled to end, appellants engaged in no mining activities of any consequence on the claims and produced no chromite ore from the premises.[3] In addition, they did nothing at all in the way of prospecting, exploring or developing the claim nor did they do any geological mapping or make any detailed computation of mining costs; as Chambers put it when discussing discovery cuts, "we were just leasing the land from him and it was his responsibility, not ours." Yet, during this same period, appellants acquired possession of the chromite bearing land adjoining the Koski properties and produced large quantities of chromite ore from that property and sold it to the United States government under the stockpiling program.

Appellants do not seriously deny that if the sole consideration for a mining lease is the share which the lessors will receive from the production of ore through the payment of royalties, there is an implied agreement that the lessee will engage in mining activities with reasonable promptness and proceed with such activities with reasonable diligence. They argue, however, that the implied agreement is not a condition, and that they did not forfeit their leasehold interest because they were never served with a notice of default and given the opportunity to cure the default. They contend that the leading California cases of *Acme Oil and Mining Co.* v. *Williams, supra,* 140 Cal. 681, and *Hall* v. *Augur, supra,* 82 Cal.App. 594, which hold that the implied agreement is a condition, are distinguishable because they involve oil, not mining leases.

It is of course true that the court's decision in the *Acme Oil and Mining* case, *supra,* 140 Cal. 681, 684, was motivated, in large part at least, by the fact that the lease involved in that case was an oil lease. The court pointed out that because oil is of a fluctuating, uncertain and fugitive nature "[t]here are few other mining enterprises where delay is so dangerous, and

---

[2]Mr. Koski testified that at first Mr. Chambers was enthusiastic about mining the property, but toward the last he did not respond to Koski's inquiries—he just grinned.

[3]There was testimony that appellants produced 10 or 12 tons of ore on which the royalties amounting to about $30 were never paid.

where diligence in securing immediate possession of the mineral is so necessary. . . ." Be this as it may, the rationale of that opinion is applicable to the facts of this case. The sole consideration moving to the Koskis, as lessors, was the payment of royalties from the sale of ore produced from the demised premises; appellants led the Koskis to believe they were going to put a mill on the property and that the claims warranted it, and that they were going to engage in large scale mining operations; appellants knew that respondents wished to take advantage of the government stockpiling program, and it is common knowledge that the value of an ore often depends upon the existence of such a program. It would be unthinkable to hold that a lessee of a mining lease can place a lessor at his mercy by wantonly and deliberately tying up valuable ore-bearing property during the existence of an advantageous government stockpiling program through the simple expediency of securing a lease which obligates the lessee to do nothing. It is even worse to hold that a lessee may accomplish this unconscionable purpose while producing the same ore from other properties because it is to his advantage to do so.

Appellants' contention, that the implied agreement that the lessee of a mining lease will commence mining activities with reasonable promptness and pursue such activities with reasonable diligence is not a condition, is not the law of this state nor is it the law followed in other jurisdictions. On the contrary, such a rule would contravene the basic principle that because mining leases are made in the expectation of operation and profits, lessees cannot hold them for speculation and maintain a "do nothing" policy. (*Crain* v. *Pure Oil Co.*, 25 F.2d 824, 830.)

In *Mansfield Gas Co.* v. *Alexander, supra,* 133 S.W. 837, the Arkansas Supreme Court held that an exclusive lease to explore for and take minerals for a long term, based on a nominal cash payment and royalties, contained an implied condition on the part of the lessee to diligently explore and develop and could be forfeited for the breach of the condition.

In *George* v. *Jones, supra,* 95 N.W.2d 609, 617, the lessee, as in this case, repeatedly asked the lessor to fulfill his obligation to extract gravel from the premises; in upholding a forfeiture of the lease the Nebraska Supreme Court stated: "It would be unjust, unreasonable, and countervene the nature and spirit of the lease, to allow the lessee to continue to hold his term for a considerable length of time, without making any effort to work the mine. Such a construction of the rights of the parties would enable him to prevent the lessor from getting his royalties under the express covenant to pay for the same, and deprive him of all opportunity to work the mine himself, or permit others to do so. The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice. It is of the es-

sence of the lease, necessarily implied, that the lessee shall work the mine with reasonable diligence, or surrender the lease."

In an annotation appearing in 76 A.L.R.2d 721, 738-739, the rule is stated as follows: "Generally, all leases of land for the exploration and development of minerals are executed with the expectation and upon the condition, either express or implied, that the land will be developed for such a purpose, and where the parties have not fully covered the subject of delay by rental provisions, the lessee's rights terminate upon his non-performance of the conditions."

Appellants' remaining contention that the location work which they performed, and the annual assessment work which they did even though the agreement did not expressly require it, were the consideration for their lease and sufficient to prevent a forfeiture is lacking in merit and no further comment is necessary.

The judgment is affirmed.

Stone, P. J., and Brown (G. A.), J., concurred.

A petition for a rehearing was denied on November 2, 1971, and the following opinion was then rendered:

**THE COURT.**—In their petition for rehearing, appellants argue that the opinion ignores their contention that the instant case is distinguishable from *Acme Oil and Mining Co.* v. *Williams,* 140 Cal. 681 [74 P. 296], and the other cases upon which we relied because the Koski lease specifically required the lessors to give appellants a 30-day notice of default before declaring a forfeiture; this they failed to do. However, as we have stated, the implied agreement that appellants were to engage in mining activities with reasonable promptness and to proceed with such activities with reasonable diligence was a condition, not a covenant, and appellant's unconscionable failure to comply with the condition resulted in an abandonment and forfeiture of their lease by operation of law. Also, appellants have consistently taken the position that they were not obligated to engage in mining activities and that they were not in default of any provision of the lease when they instituted the action in the court below to quiet title to the mining claims in question. It is manifest that a notice to cure the alleged "default" would have been to no avail.

Appellants' petition for a hearing by the Supreme Court was denied December 2, 1971.