Argued September 9, affirmed October 2, 1975

YEADON ET AL, *Appellants, v.* GRAHAM ET AL, *Respondents.*

540 P2d 1007

*Michael B. Dye,* Salem, argued the cause for appellants. On the briefs were Dye & Olson and Rolf T. Olson, Salem.

*H. W. Devlin,* McMinnville, argued the cause and filed the brief for respondents Daniel A. and Shirley Graham.

*Willard L. Cushing,* McMinnville, argued the cause for respondent Peter Kiewit Sons Co. On the brief with him were Marsh, Marsh, Cushing & Haugeberg, McMinnville.

Before O'CONNELL, Chief Justice, and McALLISTER*, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

TONGUE, J.

This is a suit for an injunction and declaratory judgment involving a 1966 mineral lease giving plaintiffs the right to remove rock from land owned by defendants Graham near Gaston in Yamhill County. Claiming that the lease had been terminated, defendants Graham entered into another lease in 1974 with defendant Peter Kiewit Sons Co. to remove rock from the same land for use in construction of the Scoggins Valley Dam.

The trial court held by its decree:

"That plaintiffs did not perform the covenants of the lease, as expressly understood by the parties, in that they failed to pay rent as provided therein and failed to perform the implied duty to mine and quarry rock, and that said lease dated February 15, 1966, was terminated by reason of plaintiffs' failure to perform as above set forth, * * *."

Although the trial judge made only general findings, at the conclusion of the trial he stated the basis for his decision as follows:

"I will be resting my decision instead on the sole issue of performance. The question, as I see it, is this: Have these Plaintiffs satisfied their obligations under the lease? And I don't believe they have.

"The parties' intent looks clear to me. The Gra-

---

* McAllister, J., did not participate in this decision.

hams wouldn't tie up their property for twenty-five years for a mere $10 a year. Reasonable minds would not differ that these Plaintiffs had a duty to get on with the business of marketing the Graham rock.

"Not only were these obligations expressly understood between the parties, but the law also stepped in and implies a duty on these Plaintiffs to develop the mining procedures in accordance with the spirit of the lease.

"Their failure to respond to this obligation and the further obligation of payment frustrates the whole purpose of the lease.

"In all fairness to the Grahams the Court has no other alternative but to hold that the lease is terminated as suggested by Mr. Devlin in his first affirmative defense.

"In this connection it is this Court's finding that there has been a failure of proof of payments in recent years, specifically from 1969."

In appealing from that decision plaintiffs first contend that the trial court erred in holding that the parties to the lease intended that the plaintiffs have a duty to begin mining operations prior to June 1974.

Plaintiffs concede that the rule of law to be applied in deciding this question is the rule as stated by this court in *Fremont Lbr. Co. v. Starrell Pet. Co.*, 228 Or 180, 199, 364 P2d 773 (1961), as follows:

"The consideration stated on the face of the lease was one dollar and the delaying rentals were nominal at ten cents an acre. It is, therefore, quite evident that the real consideration expected by the lessor was the prospect of royalties from production and, therefore, such leases should be construed against the lessee to prevent delay and to effectuate the intended purpose, i.e., to promote production and development. [Citing cases] This intended purpose included the obligation that

the lessee would test and develop the property in good faith and proceed with reasonable diligence to obtain production. [Citing cases] As said in *Munroe v. Armstrong,* 96 Pa. 307, 311 (1880) : ' * * * Perhaps in no other business is prompt performance of contracts so essential to the rights of the parties, or delay by one party likely to prove so injurious to the other. * * *' "[1]

Plaintiffs go on to say that:

"As *Freemont Lumber* [sic] indicates, the general rule is founded on the principle that the lessee must act in good faith and with reasonable diligence. The nature of the acts which constitute good faith and reasonable diligence will necessarily depend on the facts of the particular case. Where there is no commercially reasonable basis for delay, as in the case of readily marketable minerals, a duty to immediately begin work might be implied. But where the minerals are presently unmarketable, it cannot reasonably be inferred that the parties intended that mining activities begin at once.

"In the present case, the plaintiffs impliedly agreed to use reasonable diligence in developing the rock quarry. * * *"

Plaintiffs' argument in support of the contention that they did not fail to perform the duty to exercise reasonable diligence under the circumstances of this case is summarized by them as follows:

"* * * The parties knew that opening the quarry would be very expensive and that the market for the type of rock found on this property was very limited. They also knew that certain large construction projects would be developing in several years which would create a high de-

---

[1] See also Clanton v. Oregon Kelp-Ore Co., 135 Or 321, 331, 296 P 30 (1931); Ray v. Hodge, 15 Or 20, 13 P 599 (1887); Annot., 79 ALR2d 792 (1961); and Annot., 76 ALR2d 721 (1961).

mand for this rock. For these reasons, the parties intended that plaintiffs' obligation was to put forth a good faith effort to develop the quarrying operation at such time as these construction projects created a reasonably large demand for this rock, and not within a specific period of time."

See Annot., 79 ALR2d 792, 793 (1961).

After reviewing the lengthy transcript we find that although evidence was offered by the defendants that might well support such a conclusion in the absence of evidence to the contrary, there were other circumstances in this case, supported by other evidence, which fully justify the finding by the trial court to the effect that plaintiffs not only impliedly agreed to act in good faith and with reasonable diligence to develop the rock quarry, but failed to do so. Among the facts and circumstances, which lead us to the same conclusion as that reached by the trial court, are the following:

1. Although $10 was paid on execution of the lease (instead of $1, as in *Fremont*) the "delaying rentals" of $10 per year for 100 acres of land were also the equivalent of 10 cents per acre, as in *Fremont*.

2. Plaintiffs knew when the lease was signed that defendants Graham, the owners of the tract, "appeared to be destitute," were living in a "slum type dwelling" and were in need of money.

3. Although plaintiffs testified that they told defendants Graham that they wanted a 25-year lease because there was no immediate market for the rock, the owner of another quarry in the area testified that there was a market for crushed rock at that time and that plaintiffs called him and said that they had "an excellent quarry that would compete with my quarry," and that they were going to crush and sell rock. He also testified that the previous year, when he ac-

quired his quarry, he immediately took in a "cat" to "strip a quarry."

4. Although plaintiffs denied the testimony by defendants Graham to the effect that they signed the lease only upon plaintiffs' promise that they intended to immediately move in a "cat" and start "stripping the ground down," plaintiff Nelson admitted on trial that he "possibly" made such a statement. At a preliminary hearing he admitted that he "probably" told them that.

5. Not only did plaintiffs fail to do any "stripping" or any other development work, but they failed to even drill test holes or take samples of the rock for testing for hardness or for use in making bids for the sale of the rock.

6. Although plaintiffs contended that the rock on the property was too hard to be suitable for crushing and use in road construction, there were many large boulders on the property suitable for use in road fills and as "rip-rap" rock (as the rock was later used by defendant Peter Kiewit Sons Co. on the Scoggins Valley Dam). Although plaintiffs had hoped to sell rock to the Bureau of Land Management for use on its roads in the area, they made little, if any, effort to sell the rock to the Bureau of Land Management for such a use and did not list the quarry on BLM bid forms.

7. During the eight-year period from 1966 to 1974 plaintiffs took only from four to six possible purchasers to look at the rock on the property and only advertised in one newspaper for three separate weeks, at different "intervals."

8. In addition to the testimony of defendants Graham that plaintiffs made no annual $10 payments

after 1969,[2] there was testimony by defendant Daniel Graham, corroborated by another witness, to the effect that in 1972 plaintiff Nelson told Graham that he was "done with the lease" because the rock "wasn't the kind of rock he wanted."

9. Despite the fact that work on the Scoggins Valley Dam had been in progress for some time, plaintiffs made no effort to sell rock for use in that project until June 1974 when they first contacted a representative of defendant Peter Kiewit for that purpose. Even then plaintiffs failed to show that representative the area on the north side of the property where rock suitable for its use was later found by Peter Kiewit, but only showed the south side of the property, where no suitable rock was found.

At about the same time plaintiffs tried to pay $50 to defendants Graham, which they refused to accept, contending that the lease had been terminated, and then sold the rock to Peter Kiewit.

The trial court, which had the opportunity to evaluate the credibility of the witnesses as they testified, properly found, based on the testimony of these facts and circumstances, that plaintiffs had a duty to exercise reasonable diligence to develop the rock quarry and that they failed to do so. After reading the testimony, we agree.

Because of the basis upon which we decide this case it is not necessary to consider plaintiffs' further contention that the trial court erred in holding that plaintiffs failed to prove that they paid the annual rental payments after 1969, as required by the terms of the lease, with the result that the lease was terminated by operation of law for failure to pay rent, without

[2] This was disputed by plaintiffs and was the subject of a separate assignment of error.

necessity of notice to quit or pay rent, as provided by ORS 91.090.

The decree of the trial court is affirmed.