The SUPERIOR OIL COMPANY, a Nevada Corporation, et al., Plaintiffs,

v.

DEVON CORPORATION, an Oklahoma Corporation, et al., Defendants.

Civ. No. 77–0–201.

United States District Court, D. Nebraska.

Sept. 22, 1978.

Robert C. Hawley, Gretchen A. Vander-Werf, Kirk B. Holleyman, Denver, Colo., for plaintiffs.

Louis O. Satterfield, Jr., Houston, Tex., for plaintiff Superior Oil.

R. D. Randall, Wichita, Kan., for plaintiff, Petroleum, Inc.

Judson S. Woodruff, Philip D. Hart, Oklahoma City, Okl., for defendants, Devon Corp., The Miller-Christensen Partnership, Gear Drilling Co., Falco, Inc., of Delaware, Camberly Corp. and Chris L. Christensen, Jr.

Thomas C. McKee, David C. Knowlton, Denver, Colo., for defendants, Schuler-Olsen Ranches, Inc., Arthur F. Olsen, Sharon Olsen, Mary Louise Schuler, Darrel D. Schuler, Harold C. Olsen, Grace L. Olsen and the Estate of Velma Olsen Crampton, Deceased, by and through its Executrix, Mary Louise Schuler.

## MEMORANDUM

DENNEY, District Judge.

On August 1, 1949, Harlen C. Olsen and his wife, Velma, executed an oil and gas lease in favor of the Superior Oil Company. The instrument had a ten year primary term, with a provision for an extension for "as long thereafter as oil, gas, . . . or any of the products covered by this lease is or can be produced." Encompassing 3440 acres, the leased land consisted of two insular tracts covering portions of eight sections in Banner County, Nebraska. The precise legal description was as follows:

Township 18 North, Range 53 West

South ½ of Section 32
South ½ of SW ¼ of Section 33

Township 17 North, Range 53 West

NW ¼ of Section 4
North ½ and SE ¼ of Section 5
All of Sections 8, 22 [1] and 27
West ½ and West ½ of East ½ of Section 26

---

1. Superior subsequently executed a release of the West ½ of the NW ¼ of Section 22, an area of eighty acres. The Superior lease has covered 3360 acres since the release in February of 1950.

Within the primary term, oil was discovered and produced upon the SE ½ of Section 8 of the leased acreage by virtue of Superior's farmout agreement with the British-American Oil Producing Company. Despite the discovery, neither Superior nor British-American filed an affidavit of production with the register of deeds within the lease's primary term as permitted by Neb.Rev.Stat. § 57–208 (Reissue 1974).

Production on the Superior leasehold was continuous[2] until July 1, 1961, when a agreement covering certain lands to be located within the Willson Ranch Field "J" Sand Unit was executed. This unit, which included 440 acres of land covered by the Superior lease, has consistently produced oil since its creation.

In February of 1976, the successors in interest to Harlan and Velma Olsen [hereinafter referred to as the Schuler-Olsen defendants][3] granted a total of six oil and gas leases on portions of Section 26 Township 17N, Range 53W, to Chris L. Christensen. Drilling upon this land, which was part of the acreage covered by the 1949 lease, resulted in the discovery of oil. The well, which has been named the No. 1 Schuler, is located upon the SE ¼ of the NW ¼ of Section 26.

John Pruit, an exploration manager for Petroleum, Inc., an assignee of Superior's Section 26 interest, found out about the drilling of Schuler No. 1 from a daily oil and gas newspaper. Pruit telephoned Christensen and learned of the new leases. Superior and its assignees subsequently received notice that the Schuler-Olsen defendants intended to declare a forfeiture of the 1949 lease, as provided by Neb.Rev.Stat. § 57–202 (Reissue 1974), insofar as it covered lands adjacent to the new well. Superior responded by denying the existence of a forfeiture and filing this diversity action in an attempt to vindicate its perceived rights to the petroleum produced.

Alleging that the Superior lease is still in full force and effect, the plaintiffs seek relief in this Court as to the Schuler-Olsen defendants under four different legal theories: breach of contract, breach of the covenant of quiet enjoyment, slander of title and clouding of title. Superior and its assignee, Petroleum, Inc., seek further redress in the form of a finding that the working interest defendants[4] are liable for trespass to land and creating a cloud on title. The plaintiffs urge that such a finding is supported by evidence that these lessees had actual, inquiry and constructive notice of the continued validity of the 1949 lease.

The Schuler-Olsen defendants claim, *inter alia,* that the plaintiffs breached various express terms of the lease. Breach of the implied covenant to further develop has also been asserted in a counterclaim filed by the Schuler-Olsens.

A nonjury trial on the issue of liability has been held before this Court. At the time of trial, the Court took the plaintiffs' motion for partial summary judgment as to the liability of the Schuler-Olsen defendants under advisement. Due to the existence of numerous issues of fact, the Court will deny the motion and render a decision on the merits.

---

**2.** In November of 1959, and April of 1960, British-American drilled and completed two additional producing oil wells on the SE ¼ of Section 8. In March, April and June of 1960, three producing wells were drilled in the NE ¼ of Section 22 by another of Superior's assignees, the Baumgartner Oil Co.

**3.** The Schuler-Olsen defendants, all of whom have varying interests in the Superior lease, are the Schuler-Olsen Ranches, Inc., Arthur F. Olsen, Sharon Olsen, Mary Louis Schuler, Darrell D. Schuler, Harold C. Olsen, Grace L. Olsen and the estate of Velma Olsen Crampton, Deceased, by and through its executrix, Mary Louise Schuler. As the plaintiffs do not differentiate between the relative culpabilities of these defendants, the Court shall consider their liability collectively.

**4.** The working interest defendants are the Devon Corporation, the Miller-Christensen partnership, the Gear Drilling Company, Falco, Inc., the Camberly Corporation and Chris L. Christensen, Jr.

During the trial, both the working interest defendants and the Schuler-Olsen defendants moved for dismissal of the plaintiffs' case pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The Court denies the 41(b) motion of the Schuler-Olsens and will address the issues on the merits. As a decision in favor of the Schuler-Olsens might make a consideration of the plaintiffs' claims against the working interest defendants unnecessary, the Court will defer ruling upon the 41(b) motion of the working interest defendants until the claims of the Schuler-Olsens and the plaintiffs have been resolved.

## LIABILITY OF SCHULER–OLSEN DEFENDANTS

*Production Before Unitization*

■ None of the parties to this litigation suggest that the 1949 Superior lease became invalid during its primary term for failure to pay bonus or delay rental. Nor is it disputed that production in paying quantities was gained by British-American on a portion of the Superior leasehold prior to the expiration of the primary term. As a general rule, timely production of oil in paying quantities by an assignee of a lessee is sufficient to perpetuate the life of this type of lease. *Berry v. Tide Water Associated Oil Co.,* 188 F.2d 820 (5th Cir. 1951).

*Failure to File Affidavit of Production*

■ The Schuler-Olsen defendants argue that this general principle is inapplicable in Nebraska when the discovery of hydrocarbons is unaccompanied by the filing of an affidavit of production with the register of deeds before the expiration of the primary term of the lease. The applicable statute provides as follows:

> 57–208. *Lease; filing with register of deeds; effect; contingent extension provision; affidavit of happening of contingency; filing; effect.* When an oil, gas

or mineral lease is given on land situated within the State of Nebraska, the recording thereof in the office of the register of deeds of the county in which the land is located shall impart notice to the public of the validity and continuance of such lease for the definite term therein expressed, but no longer; *Provided,* that if such lease contains the statement of any contingency upon the happening of which the term of any such lease may be extended, such as and as much longer as oil and gas or either is produced in paying quantities, the owner of such lease may at any time before the expiration of the definite term of the lease file with the register of deeds an affidavit setting forth the description of the lease, that the affiant is the owner thereof and the facts showing that the required contingency has happened. This affidavit shall be recorded in full by the register of deeds, and such record together with that of the lease shall be due notice to the public of the existence and continuing validity of such lease, until the same shall be forfeited, canceled, set aside or surrendered according to law.

Neb.Rev.Stat. § 57–208 (Reissue 1974).

The Court holds that this statutory provision does not alter a contractual relationship between the parties to an oil and gas lease. By its own terms, the law refers to notice to the general public. Signatories to a contract already have notice of the instrument's existence.[5] The Supreme Court of Kansas has agreed with this analysis in its construction of a similar statute enacted by the legislature of that state. *Storm v. Barbara Oil Co.,* 177 Kan. 589, 282 P.2d 417, 425 (1955). *Accord, Davis v. Cities Service Oil Co.,* 338 F.2d 70, 73 (10th Cir. 1964). No absolute duty to file an affidavit of production exists under Nebraska law. *Cf. Davis v. Cities Service Oil Co., supra,* 338 F.2d at 73. Failure to observe Neb.Rev.Stat. § 57–208 does not extinguish the obligations ap-

---

**5.** The Schuler-Olsens have maintained throughout this suit that they had no actual knowledge that the Superior lease was in existence when they executed the leases to Christensen in early 1976. Assuming *arguendo* that their contention is true for purposes of this issue, the result does not change. The duty of filing an affidavit is upon the "owner of the lease" and not the lessor. *Davis v. Cities Service Oil Co.,* 338 F.2d 70, 74 (10th Cir. 1964).

purtenant to a contractual relationship. Nor does the leasing of the oil and gas rights on a particular tract to a subsequent bona fide lessee obviate this conclusion. The passage of a recording statute does not act to cut off any legal remedies that a prior lessee might have against a breaching lessor. The Court declines to adopt the argument by the Schuler-Olsen defendants that a second lease to a hypothetical bona fide lessee renders unenforceable any express obligations defined in a prior lease.

*Unitization of Oil as Breach*

■ The Schuler-Olsen defendants further challenge the present validity of the Superior instrument by pointing to various alleged breaches by the plaintiffs in connection with the unitization of a portion of the 1949 lease. Most of the arguments center around the interpretation of paragraph 16 of the Superior lease, which provides in pertinent part as follows:

> The unitization of this lease or any portion thereof with any other lease or leases or portions thereof shall be accomplished by the execution and filing by lesses [sic] in the recording office of said county of an instrument declaring its purpose to unitize and describing the leases and land unitized, which unitization shall cover the gas rights only and comprise an area not exceeding approximately 640 acres. . .

The Schuler-Olsens take the position that the terms of the 1949 lease prohibited the unitization of oil rights, and that the establishment of the Willson Ranch unit constituted a breach of the original Superior lease by the plaintiffs. The Court does not find this argument compelling. All of the predecessors in interest to the Schuler-Olsen defendants executed instruments evidencing consent, ratification and joinder to the unit agreement. Paragraph 1.3 of the unitization agreement clearly allows for the secondary recovery of oil. Each of these consent forms was supported by the valuable consideration of the ratification of the unit agreement by the working interest owners. More importantly, each of the rat-

ification agreements expressly provided that those holding interests in the land "agree that the terms of any lease or contract given by the undersigned or under which the undersigned claims an interest herein is extended and modified to the extent necessary to make the same conform to the terms of said Unit Agreement." Those executing the consent form further covenanted "that the drilling and development requirements of all leases and other contracts in which its several rights and interests are created or defined shall be deemed fully performed by the performance of the provisions of said Unit Agreement."

The unit agreement itself, a copy of which was given to all signers of the ratification agreement, contains the following paragraph concerning the modification of existing instruments:

> 3.3 *Amendment of Leases.* The terms and provisions of the various leases, agreements or other instruments covering the respective Tracts are hereby amended to the extent necessary to make them conform to the terms and provisions of this agreement, but otherwise are to remain in full force and effect.

The Schuler-Olsen defendants do not contend that the original Superior lease was incapable of being modified by the parties. Even if the 1949 lease impliedly proscribed the unitization of oil rights, the execution of the consent agreement by the predecessors in interest to the Schuler-Olsen defendants altered the lease to accommodate the secondary recovery of oil.

*Divisibility of Superior Lease*

■ The Schuler-Olsen defendants maintain that paragraph 16 of the 1949 lease provides for the divisibility of the leasehold. Particularly significant in the eyes of these defendants are the sections allowing for the unitization of a "portion" of the lease and prohibiting the creation of a unitization exceeding 640 acres. Since the 1976 leases to Christensen involved property covered by the original Superior lease but outside of the Willson Ranch unit, a finding of divisibility would terminate the 1949 lease as to

its non-unitized sections if a cessation of production on those tracts could be proven.

While paragraph 16 allows for the unitization of a part of the Superior lease, it does not expressly provide for a bifurcation of the leasehold upon the occurrence of such an event. The Court hesitates to find a severance by implication when the drafters of oil and gas leases commonly employ specific divisibility language in leases that are partially unitized. These covenants, generically known as "Pugh" clauses, "segregate the lands under lease outside the unit from lands included in the unit for purposes of . . . perpetuation by unit production . . . ." R. Hemingway, The Law of Oil and Gas § 7.13(D) (1971). The Superior lease contains no such clause.

Moreover, while paragraph 16 of the Superior instrument could be construed as prohibiting the inclusion of any portion of the lease within a unit of a size greater than 640 acres, the Court deems it unnecessary to engage in an interpretation of this passage. This conclusion is reached through reference to the lease modification language contained within the unit agreement and the consent, ratification and joinder form. As the Court has previously pointed out, both instruments provide for the amendment of leases that fail to conform with the terms and provisions of the unit agreement. Paragraph 3.4 of the unit agreement provides for the continuation of leases in the following language:

3.4 *Continuation of Leases and Term Royalties.* Operations, including drilling operations, conducted with respect to the Unitized Formation on any part of the Unit Area, or production from any part of the Unitized Formation, shall, except for the purpose of determining payments to Royalty Owners, be considered as operations upon or production from each Tract and such operations or production shall continue in force and effect each lease or term royalty interest just as if such operations had been conducted and a well had been drilled on and was producing from each such Tract. Each such lease and term royalty interest shall re-

main in force and effect so long as this agreement remains in force and effect.

Moreover, the unit agreement's definition of the unit area clearly refers to tract descriptions and unit boundaries encompassing more than 640 acres. To the extent that the Superior lease prohibited the formation of a unit of this size, it was modified by subsequent agreement.

*Filing of Unit Agreement*

■ The Superior lease provides that unitization is to be accomplished by, *inter alia*, the lessee's filing of a unit agreement "declaring its purpose to unitize and describing the leases and land unitized" in the recording office of the county. The Schuler-Olsens argue that the lease was violated because the unit agreement described only that portion of the Superior lease actually included within the Willson Unit, and was correspondingly recorded only as to those sections by the register of deeds. As the Court believes that the 1949 lease has not been violated on the ground of improper recordation, no need exists to consider whether the unit agreement or the joinder instrument has amended the original arrangement between the parties.

None of the parties dispute the fact that the Willson Ranch Unit Agreement was filed in Book 50, pages 46–66 of the Oil and Gas Records of Banner County, Nebraska, on August 29, 1961. The instrument expressly acknowledges the need to create a unit "to effect a secondary recovery, pressure maintenance, or other recovery program." The sole issue is whether the entire Superior lease became "unitized" within the meaning of paragraph 16 of that instrument when the Unit Agreement was executed.

The Court construes the phrase "leases and land unitized" as referring solely to lands within the unit. This conclusion stems in part from definitions commonly accepted within the oil industry. The term "unit area" has been defined as the "area described in an agreement as constituting the land logically subject to development under such agreement." Williams & Mey-

ers, Manual of Oil & Gas Terms at 485 (1971). "Unitized land" means "the part of a unit area committed to an agreement." Manual of Oil & Gas Terms, *supra* at 486. Neither of these definitions suggests that tracts outside of a secondary recovery unit are commonly thought of as being "unitized."

An inspection of the Willson Ranch unit agreement, which reflects the meanings associated with certain oil and gas terms within Banner County, Nebraska, yields a similar conclusion. This unit agreement defines "unit area" as "the lands situated within the Willson Ranch Field." "Unitized Formation" is a term descriptive of subsurface sand within the unit area.

The scope of a unitization agreement is similarly limited to acreage within the unit. All references to operations, tract participation, and royalties are made within the context of the unit. Given the central purpose of a unitization, the Court finds it difficult to accept the contention that "unitized leases and lands" include acreage outside of the unit. While production upon a unitized tract has the effect of perpetuating the life of leases partially outside of the unit, this result does not make such tracts "unitized."

Since the unit agreement was recorded against the "leases and land unitized" within the Willson Ranch area, the Superior lease was not breached and remained effective between the parties.

*Production from Unit in Paying Quantities*

■ As previously noted, the Superior lease retains its validity for a set primary term and "as long thereafter" as oil and other hydrocarbons are or can be produced. Many courts have interpreted the meaning of the term "production" and have held that a prerequisite for the extension of an oil and gas lease is the attainment of production in paying quantities. *Treasure County v. Berggren*, 154 Mont. 1, 459 P.2d 271 (1969); *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959); *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509 (1942); Hemingway, *supra*, § 6.4 at 255. *See generally* Annot., 43 A.L.R.3d 8 (1972). "Paying quantities"

are attained when a well produces a profit to the lessee over operating expenses. *Garcia v. King, supra*, 164 S.W.2d at 511. If a well is only marginally profitable to a lessee, the standard to be followed is

> whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.
>
> *Clifton v. Koontz, supra*, 325 S.W.2d at 691.

Application of the principles embodied in the *Garcia* and *Clifton* cases to the facts in the present litigation is not an easy task. The evidence in the record is sparse as to the lifting expenses incurred by the unit operator. Nevertheless, a review of the salient facts suggests that the Willson Ranch unit has consistently produced oil in paying quantities. Mr. Herman High, a senior production geologist for the Superior Oil Company, testified that oil had been extracted from the unit without cessation since its inception on October 1, 1961. High's uncontroverted testimony, which was based in part upon the records of unit production allocable to the 1949 lease, established that Superior had received approximately 77,000 barrels of oil through its overriding interest in various farmouts. This production, which represents the total amount received since the original British-American well was drilled, and includes production stemming from Superior's interest in the unit, was valued at $238,000.00. For each of the first eight months of 1977, Superior received an average of $400.00 in royalty attributable to its interest in the Ranch unit. High further testified that the figure jumped to $480.00 for the month of September.

High's expert testimony further reflected that the royalty interest of the Schuler-Olsen defendants under the 1949 lease over the same time period totalled 103,000 barrels of oil with a value of $313,000.00. For the first nine months of 1977, the royalty income due the Schuler-Olsens from the

unit ranged from $530.00 to $630.00 per month. Although the IRS records of the income of the Schuler-Olsens reflect substantially lower royalty payments, the fact remains that regular payments were made.

Reference to the records of production on the Willson unit demonstrates a gradual reduction in the production of oil since the peak extraction period during the mid-1960's. Despite the depletion of the resource, both Superior and the Schuler-Olsens have been entitled to significant portions of the unit production during 1977. In September of 1977, secondary recovery operations yielded 2,352 barrels of oil. No evidence before the Court suggests that any of the working interest owners have attempted to dissolve the unit. All of these circumstances indicate that the Willson Ranch unit is still capable of producing significant quantities of oil at the present time.

The problem facing this Court is the dearth of evidence on the pivotal issue of the lessee's profit. The Court regards the unit operator as the lessee for purposes of this litigation, as it is the party which must absorb the costs of bringing the oil to the surface. Neither Superior nor the Schuler-Olsen defendants have introduced evidence relating to this expense. The fact that royalty and overriding royalty payments have been made to the lessors and Superior is irrelevant, as both of these interests in oil are cost free. *See* Manual of Oil and Gas Terms, *supra* at 390 (royalty definition); *Meeker v. Ambassador Oil Co.*, 308 F.2d 875, 882 (10th Cir. 1962), *rev'd per curiam* 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261 (1963) (overriding royalty definition).

Analysis of the problem in terms of burden of proof solves the difficulty. The Schuler-Olsen defendants raised the question of the failure of the unit to produce oil in paying quantities as an affirmative defense in their amended answer. As this Court has jurisdiction by virtue of the diversity of the parties, state law governs the burden of proof. *Aetna Insurance Co. v. Getchell Steel Treating Co.*, 395 F.2d 12, 18 n. 9 (8th Cir. 1968); 1A Moore's Federal Practice ¶ 0.314[2] (1977). In general, one who asserts the existence of a fact material to an issue in a case assumes the burden of proof. *Bishoff v. Pieper*, 187 Neb. 783, 194 N.W.2d 177 (1972); *Bartels v. Retail Credit Co.*, 185 Neb. 304, 175 N.W.2d 292, 297 (1970). This rule extends to affirmative defenses. *Omaha Alfalfa Milling Co. v. Hallen*, 105 Neb. 193, 179 N.W. 1010 (1920). No exception to this general rule appears to apply to the "paying quantities" issue in this case. *See generally* 38 Am.Jur.2d *Gas and Oil* § 324 at 786 (2d ed. 1968).

The Schuler-Olsen defendants have failed to carry their burden of demonstrating the lack of production in paying quantities from the unit. Their bare conclusion that the production is "not sufficient" is unsupported by evidence. The Court concludes that the Willson Ranch unit has produced oil in paying quantities from its inception to the present time.

The Schuler-Olsen defendants have failed to demonstrate a breach of the express terms of the 1949 lease by the plaintiffs. This Court must find the Schuler-Olsens liable for their execution of the Christensen "top leases" unless Superior and Petroleum, Inc. violated the implied covenant to further develop prior to February of 1976.

## IMPLIED COVENANT TO FURTHER DEVELOP

The Superior lease contains no express covenant requiring the lessee to develop mineral resources found beneath the surface. This does not mean that the obligation is nonexistent. In evaluating oil and gas leases, courts have consistently implied a covenant to further develop hydrocarbons.

The Schuler-Olsens maintain that Superior and Petroleum, Inc. have failed to prudently develop those portions of the 1949 lease outside of the Willson Ranch unit. Due to the alleged lack of drilling activity, the Schuler-Olsens have counterclaimed for termination of the Superior lease. Because of the closeness of the question, the Court deems it necessary to review the expert testimony on the development issue in detail.

To rebut the accusation that Superior and Petroleum, Inc. have breached the implied covenant to further develop the 1949 lease, Superior relies upon the testimony of Joe Cox, its assistant land manager. Mr. Cox testified that Superior participated, either by farmout, dry hole contribution[6] or acreage contribution,[7] in the drilling of ten exploratory test wells on or closely offsetting the Superior lease during a six year period of time commencing in April of 1954. These efforts resulted in six producing wells.

Despite this initial success in attaining production through farmouts, and even though Cox stated that Superior usually does not farm out its best prospects, no drilling took place on the 2920 acres of the Superior lease outside of the Willson Ranch unit subsequent to 1961. Cox attributed this lack of aggressive development of the acreage to economic factors. Cox characterized Superior as being as active as any company in the oil-producing area known as the Denver-Julesburg Basin during the 1950's. According to Cox, the stagnation of the price of oil from 1958 to 1973 caused many companies, including Superior, to de-emphasize the Denver-Julesburg Basin in favor of other areas.

Cox further justified the lack of development by pointing out that a number of dry holes had already been drilled on and around the Superior lease, and that further drilling was pointless without technological indications of a probability of discovery of hydrocarbons.

Despite Cox's assertion that Superior had no prospects to offer to companies seeking a farmout arrangement during the period in question, an inter-office memorandum prepared by an employee of Superior Oil's Denver office demonstrates that Frank Baumgartner requested a farmout in March of 1960 on the same acreage where Schuler No. 1 well was successfully drilled seventeen years later. The Denver office's recommendation that the farmout be granted contained the following language:

> The geological map . . . shows there to be a fairly strong nosing under this section. Although we can not map a porosity development in the "J" sand, there is ample room for development similar to that at the Willson Ranch Field to the north or the Cizek and Heider fields to the south.

In rejecting the farmout, Superior's Los Angeles office made the following comments:

> As the . . . [Superior] . . . lease is held by production, I can see no reason at this time to grant an additional farmout to Frank Baumgartner. He still has the opportunity to earn additional acreage in Sec. 22. I feel we have moved too fast in this immediate area, as we have farmed out apparently good oil land to both British American and Baumgartner within the past year.
>
> As we are under no strain from a date standpoint, we can afford to await further drilling on acreage already farmed out.

John Pruit, an exploration manager for Petroleum, Inc., testified that his company owned a 75% interest in two 80 acre portions of the Superior lease offsetting the Schuler No. 1 well. Petroleum gained this interest through an assignment, supported by $10.00 in consideration, from the Lark Oil Company, an assignee of Superior. Pruit admitted that Petroleum, Inc. had never conducted any exploratory operations of any character on these 160 acres since it acquired the interest in March of 1958, but attributed the lack of activity to the small size of the lot and the adverse economic situation that prevailed until 1973.

---

6. A dry hole contribution has been defined as "money or property given to an oil operator in payment for drilling of a well on property in which the contributor has no direct interest, but payable only in the event that the well is a dry hole." Manual of Oil and Gas Terms, *supra* at 142.

7. An acreage contribution letter has been defined as an "agreement whereby A agrees to drill a test well in a certain location, making available to B all information from the well, in return for which B agrees to assign A certain leases held by B in the vicinity of the well." Manual of Oil and Gas Terms, *supra* at 7.

Herman High, a senior production geologist for Superior, testified for the plaintiff on the production history of wells drilled on the 1949 lease prior to the establishment of the Willson Ranch unit in October of 1961. All production from these wells, which were located on land within the boundaries of the soon to be created Willson unit, ceased upon the unit's commencement of secondary recovery operations.

High stated that he had made no recommendations to management to conduct any drilling or farmout operations on those portions of the Superior leasehold outside of the unit. Although he had only been in his present position with Superior for two years, High was able to state that the 1949 lease had been prudently developed. This opinion was based upon the fact that eight or nine dry holes had been drilled on the lease. High concluded his testimony by stating that he was aware of only one farmout request relating to the Superior lease, and that it had been received subsequent to the drilling of the Schuler No. 1 well.

In support of their contention that the implied covenant to further develop had been breached, the defendants called Floyd H. Miller, a geologist and a member of the Miller-Christensen partnership, a named defendant. From 1952 to 1959, Miller was employed in Denver, Colorado, as a district geologist for the British-American Oil Producing Company. His duties included exploration for new oil fields in a region that included Banner County, Nebraska.

In 1975, Miller became interested in the possibility of drilling an oil well in Section 26, Township 17N, Range 53W in Banner County, Nebraska. After referring to various electric logs of dry holes and producing wells surrounding Section 26 as well as geological maps outlining the contours of sand formations, Miller concluded that a favorable structural high existed. Miller prepared an area outline of potentially productive formations. This outline was given to his partner, Chris L. Christensen, Jr., so that a title check could be undertaken. Christensen conducted a title search, and obtained an attorney's title opinion. Con-

cluding that the land was not held by production, Christensen obtained leases on the area from the Schuler-Olsens. To finance the drilling on this section, Miller prepared a geological plat on the area for presentation to various prospective operators. A joint presentation was made to the Devon Corporation and the Camberly Corporation. Upon reviewing the plat and the various electric logs from adjacent wells, the geologist for Devon, James Robinson, recommended the acceptance of this particular prospect. The result was a producing oil well.

Upon cross-examination, Miller admitted that six dry holes had been drilled within one mile of Section 26, and three additional dry holes had been drilled within a mile of Section 27. Despite this concession, Miller stated that drillable prospects existed in Section 27. Miller further stated that two completely unexplored and undeveloped portions of the northern section of the Superior lease, with areas of 640 and 160 acres respectively, were drillable prospects in "an area of good established production." This conclusion as to "established production" was supported in part by Miller's statement that at least two producing wells other than Schuler No. 1 had been drilled in Sections 23 and 25.

When confronted with the two Superior interoffice memoranda concerning the Baumgartner farmout request in 1960, Miller stated that the possibility of an extension of a porosity into Section 26 was one of the reasons that the drilling of a well in that area was attractive.

Finally, Miller stated that the 2,920 acres of the Superior lease outside of the Willson unit had not been adequately and prudently developed.

James Robinson, a petroleum geologist employed by the Devon Corporation, also testified on the issue of the hydrocarbon potential of areas covered by the 1949 lease. Robinson stated that after the presentation of Miller-Christensen, he checked Miller's plat and logs against geologic information from Devon's files, as well as additional well logs and petroleum information cards.

Robinson testified that the dry holes surrounding Sections 26 and 27 had oil shows in them. Prior to recommending acceptance of the Section 26 prospect, Robinson prepared his own prospect summary, a map, and economic analysis for presentation to the management.

Prior to the drilling of Schuler No. 1, Robinson attempted to familiarize himself with the geological pattern of sand in the entire township. In particular, he studied the logs of wells in Section 22.

Donald Winslow, a petroleum geologist, did geological work on the Section 26 area in connection with some lease negotiations with the Schuler-Olsens in July of 1974. He is the sole expert on the question of prudent development who is not employed by parties to this lawsuit. Winslow has at least fifteen years of experience, as an operator and a geologist, with the oil producing areas of Banner County, Nebraska.

In his deposition, Winslow indicated that Section 26 was his "number one location" and "a pet prospect" in 1974. He suggested that the area be developed, but his attempt to procure a lease from the Schuler-Olsens fell through after he concluded that the Superior lease, of which he had actual knowledge because of his past dealings in the area, might still be in effect. Winslow never attempted to obtain a farmout from Superior, as he believed that he could not strike a deal with a major oil company on terms that were economically favorable in 1974 or when he first became interested in the property in 1962.

Winslow concluded his testimony by stating that the Superior lease had not been adequately developed subsequent to 1960.

■ A review of the legal character of the implied covenant to further develop is necessary before the "prudent operator" rule can be applied to the facts in this case. In general, once oil is discovered on a leasehold, the owner of the working interest has the duty "to drill such additional wells to develop the premises as a reasonably prudent operator, bearing in mind the interests of both lessor and lessee, would drill under similar circumstances." 5 Williams & Meyers, Oil and Gas Law § 832 at 215 (1977); 2 Brown, The Law of Oil and Gas Leases § 16.02 at 16–16 to –17 (2d ed. 1973). A balance must be struck "between the lessor's interest in rapid production of the minerals and the lessee's interest in reduced drilling and operating costs." 5 Williams & Meyers, *supra,* § 832 at 214. *Accord, Sauder v. Mid-Continent Petroleum Corp.,* 292 U.S. 272, 54 S.Ct. 671, 78 L.Ed. 1255 (1934).

The Nebraska Supreme Court, in considering a lease involving the mining of gravel, has explained the reasoning behind the implication of the covenant:

Where a lessee covenants expressly to pay the lessor a certain royalty on all the minerals or products that may be mined under a mining lease, even though there is no express covenant that the lessee shall work the mine continuously, or in any particular way, or at all, there is manifestly an implied covenant on his part that he will work it as such mines are usually worked, with ordinary diligence, under the surrounding circumstances; not, indeed, simply for his own advantage and profit, but as well to the end that the lessor may secure the actual consideration for the lease. Such a covenant arises by necessary implication. It would be unjust, unreasonable, and countervene the nature and spirit of the lease, to allow the lessee to continue to hold his term for a considerable length of time, without making any effort to work the mine. Such a construction of the rights of the parties would enable him to prevent the lessor from getting his royalties under the express covenant to pay for the same, and deprive him of all opportunity to work the mine himself, or permit others to do so. The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice. It is of the essence of the lease, necessarily implied, that the lessee shall work the mine with reasonable diligence, or surrender the lease.

*George v. Jones,* 168 Neb. 149, 163–64, 95 N.W.2d 609, 616–17 (1959).

Another rationale underpinning the implication of the covenant is avoidance of speculation on the part of the lessee. Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases § 61 at 158 (2d ed. 1940). *Accord, Producers Pipe & Supply Co. v. James,* 332 P.2d 958 (Okl.1958); *Town of Tome Land Grant v. Ringle Dev. Co.,* 56 N.M. 101, 240 P.2d 850 (1952).

▆▆▆ The implied covenant to further develop does not lose its vitality where part of an oil and gas lease is included within a secondary recovery unit and a portion of the acreage is excluded. Speculation on the part of a lessee, with a concomitant deprivation of the potential benefits of further development to the lessor, is still a possibility. 6 Williams & Meyers § 955 at 725–26 (1977). While production within the unit acts to extend the primary term of the entire lease, the lease remains subject to the implied obligation to further develop. 4 Kuntz, A Treatise on the Law of Oil and Gas § 48.3 at 193 (1972); *Dubois v. Midwest Oil Corp.,* 219 F.Supp. 593, 596 (W.D.La. 1963); *Wells v. Continental Oil Co.,* 244 Miss. 509, 142 So.2d 215 (1962); *Clovis v. Pacific Northwest Pipeline Co.,* 140 Colo. 552, 345 P.2d 729 (1959); *Trawick v. Castleberry,* 275 P.2d 292 (Okl.1953); *Hunter Co. v. Shell Oil Co.,* 211 La. 893, 31 So.2d 10, 14 (1947). In at least one jurisdiction, where a lessee causes the unitization of a portion of a leasehold, its responsibility to fulfill implied covenants becomes "correspondingly greater toward the excluded acreage than it was before severing by unitization." *Gregg v. Harper-Turner Oil Co.,* 199 F.2d 1, 5 (10th Cir. 1952) (implied covenant to further explore).

After considering all of the expert testimony in light of the applicable standards of law, the Court concludes that the implied covenant to further develop the Superior lease has been breached by the plaintiffs. None of the plaintiffs' expert witnesses referred to any specialized data in their analyses of the likelihood of discovery of

hydrocarbons on the 1949 lease subsequent to 1960. Their conclusions were supported solely by a recitation of the general economics of the times and reference to the number of dry holes drilled on and off-setting the Superior lease. In contrast, Floyd Miller, James Robinson and Donald Winslow concluded that good drillable prospects existed within the Superior lease. These conclusions were based upon electric logs, geological maps, plats and petroleum information cards, as well as the fact that oil shows were found in some dry holes. The plaintiffs do not maintain that this information was unavailable to them for an evaluation of production probabilities. Nor could Superior take such a position, as much of the data was derived from readings taken from its own drill sites. Moreover, the electric logs introduced into evidence have notations thereon demonstrating that such readouts are readily obtainable from commercial dealers in regional oil information.

The conclusion that undeveloped portions of the 1949 lease are potentially productive is not attributable to modern technological advances. Superior made a similar judgment when it rejected the Baumgartner farmout request on Section 26 in 1960. The lessee's own interoffice correspondence warned against moving "too fast" in the farming out of "apparently good oil land." This rejection was based, at least in part, upon the analysis of a geological map of the area.

Superior's assistant land manager testified that the 1960 memoranda referred to porosity development[8] rather than the development of hydrocarbon resources. The record reflects that Floyd Miller was not in agreement with this characterization. Moreover, the original Section 22 letter agreement with Baumgartner indisputably called for conventional drilling for oil. The Superior rejection of an "additional farmout" to this operator makes no mention of the distinction testified to by Joe Cox. Even if the Court were to accept Cox's

---

8. None of the experts at trial defined the meaning of "porosity development." The Court assumes that such development increases the

production of formations through such permeability-enhancing techniques as sandfracing.

interpretation of the 1960 Baumgartner request, it seems clear that porosity development has the ultimate goal of development of oil and gas resources. This goal is no different from that embodied in conventional leases and farmout arrangements.

▪ The plaintiffs have presented evidence that economic conditions precluded the development of the Superior lease from 1958 to 1973. The alleged lack of a favorable market during this time period is significant, as a breach of a covenant to further develop cannot occur unless drilling would result in the production of oil and gas in paying quantities. *Chenoweth v. Pan American Petroleum Corp.,* 314 F.2d 63 (10th Cir. 1963). In the context of this implied covenant, paying quantities "means sufficient oil or gas for the lessee to recover his capital and operating expenses and to make a reasonable profit thereon." 5 Williams & Meyers, *supra,* § 832.1 at 219.

The problem with the plaintiffs' contention of economic adversity is the lack of compelling supportive evidence in the record. While Superior was not engulfed with farmin requests during this fifteen year period, the sole formal farmout request subsequent to 1958 was rejected for reasons other than financial conditions. Rather, the Baumgartner denial was based upon Superior's express desire to refrain from developing the leasehold too quickly.

Expert testimony presented by the defendants suggests that the economic disadvantages of extracting oil from the Superior lease stemmed from the terms of farmout agreements with major oil companies such as Superior rather than external monetary pressures. Before he confirmed the existence of the original Superior lease, Donald Winslow was ready and willing to commence his own operations on Section 26. It was only after Winslow ascertained that the land might be held by production that his plans fell through.

▪ Unlike Winslow, Superior Oil was not subject to an overriding royalty interest that might have impeded the development of the 1949 lease. In fact, Superior's practice of retaining the working interest in its best prospects should have encouraged the drilling of additional wells. Furthermore, the duty of Petroleum, Inc. to further develop its portion of the lease is not altered by Superior's overriding interest. Once a farmout arrangement is executed, the fact that a lessee retains an expense-free interest in minerals cannot influence the calculation of "paying quantities" of oil and gas to the detriment of the lessor. *Berry v. Wondra,* 173 Kan. 273, 246 P.2d 282, 292 (1952).

While none of the experts who testified in this case based their opinions upon a precise mathematical evaluation of the likelihood of profitable production, the Court does not deem this fatal to a finding of a breach of the implied covenant. Winslow, Miller and Robinson all made positive geological evaluations of the potential of the Superior lease. Winslow had reached the further conclusion, based upon his experience as an operator, that a well should be drilled. Miller and Robinson made recommendations to develop Section 26 to their respective business partners and management, and the decision was made to drill in this area. These decisions to drill were obviously made with the expectation of a profit. Similarly, Baumgartner made a bid for a farmout in anticipation of a return on his investment. Taken collectively, these actions are representative of the "prudent operator" standard. Superior and Petroleum have failed to measure up to this standard in their efforts to develop the leasehold.

This conclusion is supportable despite Superior's contention of a deleterious economic climate from 1958 to 1973. Even if the Court were to categorically accept Superior's position, the evidence reflects the passage of over three years since the price of oil took an upward turn. No effort was made by plaintiffs to take advantage of the growing demand for domestic oil during the Arab embargo. Superior has been content to derive overriding royalties from the operator of the Willson Ranch unit during this period.

Undisputed evidence demonstrates that Superior has not incurred any drilling costs nor sought farmins with regard to their lease since at least 1962. The Court concludes that such conduct amounts to a breach of plaintiffs' duty to prudently develop an oil and gas lease.

*Notice as a Prerequisite to Relief*

Before a lessor can prevail upon a claim of breach of an implied covenant to further develop, it is normally required that "he must first serve the lessee with a notice specifying the manner in which the lessee has not complied with such covenants and allowing a reasonable time thereafter for the lessee to comply." 2 Brown, *supra,* § 16.03(4) at 16–113. *Accord, Robinson v. Continental Oil Co.,* 255 F.Supp. 61, 64 (D.Kan.1966); *Sapp v. Massey,* 358 S.W.2d 490 (Ky.App.1962). Notice serves the purpose of advancing the policies that underlie implied covenants.

While notice is often a desirable prerequisite to an adjudication of breach, it is not an absolute *sine qua non* to the issuance of a decree of cancellation. Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases, § 60 at 154–55 (2d ed. 1940); *Benedum-Trees Oil Co. v. Davis,* 107 F.2d 981 (6th Cir. 1939), *cert. denied* 310 U.S. 634, 60 S.Ct. 1076, 84 L.Ed. 1404 (1940); *Howerton v. Kansas Natural Gas Co.,* 81 Kan. 553, 106 P. 47, 51 (1910), *rev'd on other grounds* 82 Kan. 367, 108 P. 813 (1910). *Cf.* 5 Williams & Meyers, *supra,* § 834 at 240–40.1. Each case must stand upon its own facts in this regard. After a close examination of the record, the Court concludes that this case presents one of the few factual situations where an adjudication of breach of the implied covenant to further develop is not barred by the failure of the lessor to demand further drilling.

Demand by a lessor is not necessarily required if a portion of an oil and gas lease has gone undeveloped for an unreasonable period of time. *McMahan v. Boggess,* 302 S.W.2d 592 (C.A.Ky.1951); *American Wholesale Corp. v. F. & S. Oil & Gas Co.,* 242 Ky. 356, 46 S.W.2d 498 (C.A.1932).

Superior has failed to do any developmental work on the 1949 lease for at least fifteen years. The Court finds this delay to be unreasonable in light of the favorable geological information available and Superior's apparently conscious decision to forego further development as evidenced by the rejection of the Baumgartner farmout request in 1960. The fact that the 1976 leases were executed prior to the initiation of this lawsuit and the filing of the Schuler-Olsen counterclaim does not excuse the delay. Nor does this sequence of events preclude a specific finding of breach of the developmental covenant by this Court. *See, e. g., Benedum-Trees Oil Co. v. Davis, supra,* 107 F.2d at 986; *American Wholesale Corp. v. F. & S. Oil & Gas Co., supra,* 46 S.W.2d at 499–501.

Moreover, the imposition of a duty on the Schuler-Olsens to demand further drilling at this juncture would be patently unfair to these defendants. Superior is undoubtedly willing to develop Section 26 of the 1949 lease at the present time, as it has now been established that mineral resources exist beneath the surface. The discovery of hydrocarbons in this section will probably stimulate new evaluations of other portions of the Superior lease. Any production attained from such evaluations would be indirectly attributable to the efforts of those who caused the Schuler No. 1 well to be erected. Development of the Superior lease by the plaintiffs should not be permitted when the motivation for further drilling can be traced to the success of the defendants. For the first time in at least fifteen years, the purpose behind an implied covenant to further develop is being fulfilled on this acreage. The dilatory practices of Superior and Petroleum would be rewarded if this Court allowed them to atone for their past failings at this late date. Equitable principles militate against such a result.

Although such a finding is not required for the Schuler-Olsen defendants to prevail, the record suggests that the 1976 leases were executed by the lessors without actual knowledge of the existence of the Superior lease. While such unawareness does not

usually excuse a lessor from the binding obligations contained within a pre-existing oil and gas lease, the lack of knowledge is relevant in a consideration of its ameliorative effect on any need for notice to a lessee regarding violation of an implied covenant. This is especially true where the ignorance of a lessor is attributable in large measure to the lack of lease development by a lessee.

The evidence in this case establishes that none of the Schuler-Olsen defendants were over fifteen years of age at the time that Harlan C. and Velma Olsen executed the Superior lease in August of 1949. No communication existed between the Schuler-Olsens and Superior between the time of the payment of the last delay rental in 1958 and the drilling of the Schuler No. 1 well. While the Schuler-Olsens received royalties from production upon the Willson Ranch unit, these payments came from British-American and Gulf Oil, the unit operators, and the production purchaser since 1970, the Permian Corporation. None of the checks mentioned the Superior lease, Superior Oil, or Petroleum, Inc. No royalty payments were made by the plaintiffs on this production.[9]

From 1960 to 1977, the Schuler-Olsens received some correspondence, division orders and other documents concerning the Willson Ranch unit from companies other than Superior and Petroleum, but none of these documents mentioned Superior, Petroleum, or the Superior lease, with the exception of one 1959 division order signed by Velma Olsen and Mrs. Schuler's trustee. Nor were Superior, Petroleum, the Superior lease or Section 26 mentioned in the estate inventory of Velma R. Crampton, the former wife of Harlan C. Olsen.

A letter from Mr. Wendell Haley of Transcontinent Oil Company in 1972 did refer to Superior and a 1949 lease covering a portion of Section 26 in Township 17 North, Range 53 West, but it questioned whether the lease was held by production in the Olsen Field to the north. On August 1, 1949, Superior acquired from H. C. and Velma Olsen a lease on 5,742 acres. That lease is still held by production from the Olsen unit, where Superior is the operator. There is a Section 26 in the Olsen Field. The potential for confusion between the sections is great.

In 1974, Donald C. Winslow executed a $960.00 draft for a lease on portions of Section 26, Township 17 North, Range 53 West. The check was returned to the Schulers and Olsens unpaid, with the inscription "title not valid now." Winslow's refusal to pay, which was due to his actual knowledge of the existence of the Superior lease, was never explained to the Schuler-Olsens. None of these defendants was ever advised that Superior, Petroleum or the Superior lease were related to the refusal to pay the draft.

Each of the Schulers and Olsens testified that the production source of the Gulf and Permian royalty payments was unknown. None knew that these payments were related to Superior, Petroleum or the Superior lease. Moreover, the Schuler-Olsens were receiving royalty payments during this time frame from a number of different sources of production located on various leaseholds encompassing approximately 20,000 acres of land in western Nebraska.

After considering all of the evidence and weighing the credibility of the Schuler-Olsens, the Court concludes that these defendants had no actual knowledge of the existence of the Superior lease at the time of the granting of the 1977 leases. The record supports the inference that the Schuler-Olsens are farmers and ranchers who are not sophisticated in oil and gas matters. Leases that they executed were prepared by men in the oil and gas industry. Although an experienced oil and gas landman would

---

9. The plaintiffs maintain that acceptance of royalties by the Schuler-Olsens estops them from claiming a breach of the implied covenant to further develop. As the evidence suggests a lack of knowing acceptance of payments resulting from oil production, an estoppel may not exist. Moreover, even if the royalty due was accepted with knowledge of its source, the waiver of the right to seek cancellation is limited to that portion of the lease from which the oil was extracted. *Lake v. Ohio Fuel Gas Co.,* 2 Ohio App.2d 227, 207 N.E.2d 659, 663 (1965).

probably have become aware of the existence of the Superior lease in light of the Transcontinent letter and the Winslow draft, the Schuler-Olsens lacked sufficient knowledge of practices within the hydrocarbon industry to connect these events with the possibility that the 1949 lease might still be held by production.

■ The Court is not suggesting that an absence of actual knowledge constitutes a defense to the express provisions of a lease that is held by production. The narrow holding of this Court is simply that a lessor's ignorance of the existence of a pre-existing lease is one factor to be weighed on the issue of whether, in all equity, an adjudication of breach of an implied covenant must be preceded by a demand upon an operator.

*Nature of Relief*

Subsequent to a finding of a breach of the implied covenant to further develop, a court must determine whether legal relief or an equitable remedy is appropriate. If a monetary award is adequate to provide complete redress to the defendants, the Court, in accordance with its order of bifurcation, would defer ruling on the amount of the judgment pending the introduction of further evidence on the extent of the harm.

Since monetary damages are often inadequate and inequitable when a development duty goes unfulfilled, equitable relief is frequently granted. 5 Williams & Meyers, *supra*, § 834 at 245.2–246. The shortcomings of a legal remedy are especially evident under the facts in this case. Moreover, the Court executed the order bifurcating liability and damages prior to the filing of the Schuler-Olsen counterclaim. The counterclaim, which contains the allegation of breach of implied covenant to further develop, prays for equitable cancellation of the Superior lease. No damages are sought by the Schuler-Olsens. Under these circumstances, an exercise of this Court's equitable power is warranted.

■ In their counterclaim, the Schuler-Olsens seek the absolute cancellation of the entire Superior lease. Such a form of relief is within the power of a court of equity. *George v. Jones,* 168 Neb. 149, 95 N.W.2d 609 (1959) (gravel lease). *See also Mayhew v. Callard,* 312 F.2d 295 (7th Cir. 1963); *Sparks v. Midstates Oil Corp.,* 251 F.2d 71 (10th Cir. 1958); *Yeadon v. Graham,* 273 Or. 234, 540 P.2d 1007 (1975) (quarry lease); *Harris v. Morris Plan Co.,* 144 Kan. 501, 61 P.2d 901 (1936).

■ As the evidence demonstrates that the Willson Ranch unit has consistently produced oil in paying quantities, the Court declines to grant the request for total cancellation. An entry of a decree cancelling those portions of the Superior lease outside of the Willson Ranch unit seems more equitable under the facts in this case. Partial cancellation of oil and gas leases prevents penalization of operators who maintain producing wells on a portion of the leasehold. Other courts have recognized the utility of this more moderate decree. *McMahan v. Boggess, supra ; Amerada Petroleum Co. v. Sledge,* 151 Okl. 160, 3 P.2d 167 (1931).

The Court is aware of the widespread use of the conditional decree of cancellation when an implied covenant to develop is breached. This form of remedy cancels the lease if the operator fails to drill a certain number of wells within a specified period of time. However, the relative equities present in this case militate against the imposition of such a decree. Superior and Petroleum, Inc. showed no interest in developing those portions of the Superior lease outside of the unit before the completion of the Schuler No. 1 well. No evidence suggests that the plaintiffs intended to develop Section 26 or any other non-unitized area of the 1949 lease prior to the discovery of oil. Unconditional cancellation is warranted in the absence of such intent. *Harris v. Morris Plan Co., supra.* The prolonged lack of development by Superior and Petroleum also suggests the propriety of this form of remedy. *Sparks v. Midstates Oil Corp., supra ; McMahan v. Boggess, supra.*

As previously stated in conjunction with the question of a need for a demand to develop, the plaintiffs would undoubtedly

be willing to drill upon the Superior lease if the Court were to issue a conditional decree at the present time. As the efforts of the defendants appear to constitute the sole motivation for the plaintiffs' desire to further develop, the Court cannot, in all fairness, allow Superior and Petroleum such an opportunity in light of the substantial undeveloped acreage and the unreasonable duration of the non-development.

Because of all of these factors, the Court holds that the Superior lease, insofar as it covers acreage outside of the Willson Ranch unit, has terminated due to the plaintiffs' breach of the implied covenant to further develop. The Court further holds that the termination preceded the execution of the Christensen leases. As the Superior lease was not a binding instrument in 1976, the plaintiff cannot recover from the Schuler-Olsens for their subsequent leasing activity. *Benedum-Trees Oil Co. v. Davis, supra,* 107 F.2d at 986.

Since the Schuler-Olsens had the right to lease lands within Section 26 to the working interest defendants, the plaintiffs have shown no right to relief, upon the facts and law, as to the 1976 lessee and his assignees. The Rule 41(b) motion of the working interest defendants shall be granted.

An order has been filed contemporaneously herewith in accordance with this Memorandum Opinion.